Mr. Mercer, when you're ready. I think the biggest issue here, from my standpoint, is the trial court improperly weighed credibility and conflicting evidence in the summary judgment for national unions. The primary problem I have with the trial court's decision, not that it couldn't have gotten there ultimately, but you can't get there in the context of a summary judgment. This case involves coverage for my client ANCO Insulations. It's an asbestos insulation company. Let me see if I understand it here. We had some 2,700 suits that were filed between 1987 and 2008, and none of those were reported until 2009. Is that right? No, that's not exactly right. What happened is, again, ANCO has been sued since the 80s, thousands of suits filed against it. Oh, I know. I understand. In the context of this particular litigation incepted between ANCO and its excess carriers, in the context of doing discovery, this one primary policy from 1987 that was issued by national union was discovered, and it was discovered that it does not have an asbestos exclusion on it. So at that point in 2009, ANCO tendered the 2,700 lawsuits to national union in 2009. National union's response was great. We will participate in these suits that are still ongoing as of this date, but we're not going to participate or reimburse any prior defense cost because we went tender. So we went back. There's a clear requirement in the policy that the claims and suits be immediately reported. Absolutely, and I would not be standing before you if there were not some additional facts. But we went back. I mean, ordinarily that would be the end of it, wouldn't it? Absolutely. All right, okay. I 100% agree with you. So what makes this a little different is we went back and started investigating whether there were any prior tenders or any prior communication between ANCO and national union prior to 2009, and the claims handler for national union signed an affidavit initially saying this is our first notice. We've never heard of ANCO before this date. We never received anything. That turned out to be incorrect. We have two tenders that were received that national union admits receiving in the year 2000, and the only reason we have these is because the claims handler at that point in time, Mr. Marco Spadacenta, had copies of his responses in his personal files. National union as a company has no records. They can't certify their own policy. They have no records of anything regarding ANCO. But this claims handler, Mr. Spadacenta, had his responses to two tenders he received in the year 2000. Now, these tenders. In fairness, though, you all should have your own tenders. We should, but, again, it's asbestos. You go back 20, 30 years, and ANCO's records were transferred. It sold the assets. And everybody, you know, is having trouble with their records. And that's why now with electronic records it's a little bit more likely you find things. But, anyway. And I'm not casting aspersions on, you know, nobody having certain records. But based on what we do have, what we do know is that national union received these two tenders in March of 2000 with respect to two different suits, the Mason suit and the Valdez suit, I believe. And we don't have the actual suits. But Mr. Spadacenta responded that, well, based on the two policies that are referenced in the tender, which were issued in the 90s, you have no coverage available to you because those policies have asbestos exclusions on them, which is true. It's not clear which policy they were. ANCO was reporting those claims. Correct. The assumption, and I'll give them the benefit of the doubt, let's assume that they came in referencing these policies issued in the 90s. Our contention is when national union received those tenders in the year 2000, it should have conducted a policy search. Now, do you have any law that requires a company to do that? I have. The answer is no. But I do have an expert, a claims handling expert and a bad faith expert. National union did not retain any expert to contradict his testimony. His affidavit is, especially in these long-term, long-tail cases where claims go back 20, 30, 40 years, good claims handling practice mandates that you conduct a policy. Yeah, but the nice thing in Louisiana is everything is statutory, and it seems like they have a lot of statutes that prescribe requirements for insurance companies, and they don't have one apparently that requires this policy review every time somebody makes a claim. Right. There's no law either way. There's no law saying you don't. Yeah, but in Louisiana, because we have ‑‑ because it's statute, it's code-based, isn't an insurance company that's told you have to do these 500 things by code entitled to rely on that when there isn't anything that says, and you also have to do this policy search, as opposed to being told by some expert hired by a plaintiff you should have done the search. Well, there's no law either way. I mean, you're right. There's a ton of regulations on insurance companies, but, again, this company is based in New York. It does ‑‑ you know, it issues policies nationwide, and they're not disputing, which I think is important here, that, well, we couldn't have found it. They admit, well, if we'd have looked, we'd have found it, and so all you're really talking about is when we get this claim. Right, but you're implying a duty on them in a code-based state that is nowhere to be found in the code. I mean, in Texas we could say, well, you've got this common law duty and the battle of the experts about what that duty is. I mean, you don't have that in Louisiana, do you? You do. You do have a duty to investigate a claim. Okay. So it would be part of that. That's the claim, not the policy. Well, to respond to a claim, you have to ‑‑ The claim is I'm entitled to coverage under the 1994 policy. Well, that's the question. That's the question presented by this court is, if that's the court's opinion, is that an insured has a duty to specifically identify the policy under which it is tendering a claim and that an insurance company has no duty at all to go beyond that to type ANCO into a form and go find policies, then okay, but ‑‑ I mean, my question is a little bit deeper. My question is, are we to imply such a duty in a state that is code-based and has rather extensive codes, I mean, about a lot of things, including insurance? Are we to imply such a duty and then hold an insurance company liable for having failed to comply with such a duty that's nowhere in the code? There's a duty, a statutory duty of good faith, fair dealing. There's a duty to investigate. That's the duty they have. Now, this court may find as a matter of law the duty does not extend to conducting a policy search. Do we know what ANCO's letter said when they ‑‑ We do not. It's lost the antiquities of time. So we have those two tenders. I understand it's frustrating. We have those two tenders, and my position there is all National Union had to do was conduct a policy search. They would have found this policy, the 87 policy, would have seen that it did not contain an asbestos disclosure and could have informed ANCO. Now, beyond that ‑‑ And other than just the general duty to investigate, what is your authority for the proposition that they had to go look for other policies? It's the general duty to investigate. Okay, that's it. Duty to investigate encompasses that. Right, and the expert's uncontradicted opinion that they did not comply with that duty when they didn't do a simple policy search. And beyond that issue, we have around the same time ANCO's ‑‑ the Zurich claims handler, because, again, this company had policies for decades. Zurich's claims handler made a call. Zurich is another carrier? Yes, they're another carrier. Over the years, ANCO was insured by Royal, Zurich, National Union, Hartford, a whole litany, because we're talking 34 years. Around the same time period, in 2000, the Zurich claims handler called Mr. Spadacento, the very guy who responded to these tenders, because the Zurich primary policies were becoming exhausted. So he's calling these other carriers. You guys have any coverage? He, in his testimony, his affidavit states he was ‑‑ And he had a contemporaneous memorialization. He wrote a letter to ANCO after he spoke to Mr. Spadacento and said, I spoke with National Union. They told me all of your policies have exclusions on them. So even if National Union had no duty to go do a policy search, even if they were entitled to simply respond to the policies that were on the tender, they certainly can't misrepresent their coverage. That's a question of fact. The trial court found, well, Mr. Spadacento doesn't remember talking to Mr. Nielsen, but he said he wouldn't have said that because, you know, he never looked at any of the other policies. Well, you're weighing evidence and you're weighing credibility. But this is misrepresenting coverage to another carrier, not to the insurer. Which was then transmitted to you. Okay, but it's ‑‑ so, again, you're having a ‑‑ I mean ‑‑ Well, I don't know that you can misrepresent your coverage to anybody, but in this case the misrepresentation was made to a co‑insurer who then transmitted it. But is it a co‑insurer or a primary seeking excess? That's what I was trying to figure out. It sounds like they're looking for an excess policy. They're both ‑‑ both Zurich and the National Union issued both primary and excess policies. Okay, but to me I would take this as the primary looking for excess. Well, they were looking ‑‑ It's a different matter entirely when you're asking other people to come in on the primary than when you're trying to trigger excess. Well, they were doing both because ‑‑ I didn't take the Zurich inquiry that way. To me the Zurich ‑‑ They were co‑insurers. That was Zurich's position. Yeah, it's different years. So Zurich had primary coverage, you know, beginning in the 70s. They passed the baton to National Union on both primary and excess. And the policy we're here to talk about is a primary policy. No, I get that. It wasn't clear to me that that was what Zurich was inquiring about. Well, again, that might be another question of fact because, again, the trial court did not have that before it. All it had was the Zurich claims handler's affidavit. And I believe his affidavit references primary policies, Your Honor. In my recollection, as the affidavit says, I was told the primary policies contained asbestos exclusions, which turned out not to be true. So that's simply a question of fact that the court determined, well, we believe the National Union guy because it makes sort of more sense to us than what the Zurich guy said. It's a question of fact. Let me ask you something about the penalty issue. I don't mean to switch subjects, but you're starting to get low on time. So under 22-1892, we have this issue about within 30 days after receipt of satisfactory proof of loss, then you've got to pay or you trigger the penalty. And I'm just asking because in Texas the way that works on the defense costs is you have to send the bill for the attorney, and then that triggers the 30 days because just a general defense obligation isn't anything we could run 30 days on. So as I appreciate your opponent's argument, they're saying you didn't do that. You didn't send us the attorney bill, and then we didn't pay for 30 days. That issue is not before the court. It wasn't before the trial court. I don't think it was before the court. My only position is he did argue that. Yes, and I think that's important because we're being asked to construe a statute, and the statute triggers the 30 days from satisfactory proofs of loss, which I don't know what that means in Louisiana, but in Texas an analogous statute has been interpreted. I don't mean to rely on Texas. It's just what I know better. It has been interpreted to mean the bills, the fee bills of the attorney, because otherwise there's nowhere in an ensuing defense cost scenario where somebody's just denying a duty to defend. You have nothing to measure the 30 days on just in this idea of a defense. And that may be, and that issue wasn't before the trial court, and they argued it on the appeal, but the trial court merely held, look, we think they found a question of fact as to whether National Union responded within the 30 days. All right, just a question of fact. But responded to what? Responded to the tenders. Is there evidence of sending attorney bills as opposed to saying you should defend us? There were signs. Now, again, I don't know when because we didn't ask for an affirmative award. The only issue on the bad faith, quite honestly, is very narrow. In the event, what the trial court held is even if we proved, whether the standard is bills, whether the standard is the suits, whatever, even if we proved we sent them the bills and they didn't pay within 30 days, under the statute we're not entitled to penalties because ANCA was being provided with a defense by another carrier. So what the trial court held is as a prerequisite. No, I understand what the trial court held, and I'm asking you whether there's evidence in the record because they're saying they said on page 41 of their brief that there is no evidence that you sent a bill that would then trigger a 30-day. So I don't want to go through a very elaborate, convoluted construction of a Louisiana statute to find out it doesn't matter because there's no evidence that you did anything to trigger it. It wasn't part of what was before the trial court. So they're kind of jumping ahead. In other words, the trial court didn't decide that. No, no, no, the trial court didn't decide that issue. But did they move on that? They moved on no damages. No penalties. They said we don't owe penalties. Because we didn't have any damages. Not because it wasn't tendered to us or because we didn't receive the bills. Their argument was as a matter of law, even if we didn't pay timely because you didn't come out of pocket for your defense cost, that these statutes, the law, Louisiana law requires you to have damages. Okay. Well, I'll ask your opposing counsel. And that issue has been addressed by the Louisiana Supreme Court. So I'll sit down since I'm about out of time. All right. Thank you, Mr. Cozad. Okay. Mr. Cozad. Your Honor, it's Richard Cozad for the APLE, National Union Fire Insurance Company of Pittsburgh. I'll refer to it as NUFIC. As I think Your Honors have gleaned, this case involves interpretation of a contract. Do you mind, since we were on this and it's fresh in my mind, do you mind addressing that point? Because on page 41 of the brief you say there's no evidence that ANCO submitted a satisfactory proof of loss to trigger the claim, i.e. send the attorney bills. Was there anything that you did that would have triggered their obligation to put that evidence into the record? Because he's saying you didn't. So that's what I'm asking. Your Honor, the bad faith claim, as I recall, was made late in litigation, 2010. And the essence of the bad faith claim is that NUFIC did not timely respond to these tenders and these submissions of these lawsuits. However, the bad faith statute requires a satisfactory proof of loss. Did you make that argument in the district court? I think the argument in the district court was that this case does not count as bad faith when you read the statute and the provision that Appellant is citing to award them relief, because there's two sections of the statute. What Appellant is claiming is that they do not have to prove arbitrary, capricious, without reasonable cause. They don't have to prove a damage because of the way the two statutes intersect with each other. We took the position that, yes, they do. They have to make a satisfactory proof of loss. They didn't. And they have to prove arbitrary. Did you argue that, that you did not make a satisfactory proof of loss? I don't think so, Your Honor. You don't think so? I don't think so. Well, then why would there be expected to put in evidence of a satisfactory proof of loss? Well, that's a predicate to recovery of the damages they're seeking under bad faith. Right, but this is a summary judgment. You've got to claim something for them to have to respond. If they go to trial and they don't put on any evidence, then fine, they lose. But I'm saying in summary judgment you have to say you are missing this element of your claim, and then they have to bring forward evidence of that element of the claim. Your Honor, I know it was discussed in the deposition of the representative of NUFIC. Okay. What is your argument that Section 1892 has the same requirements or lack thereof to Section 1973? Your Honor, the impetus for the bad faith argument being advanced by Appellant is initially 1892. However, and the reliance of that statute is based upon the OOB decision, which was a Louisiana Supreme Court decision. However, the OOB decision focused on Section A3 of 1892, which talks only about property loss. In other words, OOB involved Katrina and Rita damage claims to homeowners. And in that situation, in that particular instance, the reference to the damage claim, you have to go to 22-1973 in A3. Our position here is that these are bodily injury liability third-party claims. They have nothing to do with A3 and nothing to do with property damage. Therefore, you look to the damage provisions in 1892, which require a satisfactory proof of loss and which require arbitrary, capricious, and without good cause, all of which we suggest is not present in this case. I mean, I don't know why they did this in the two statutes, Your Honor. I've gone over this in other cases. But you have to integrate the two statutes, and it depends upon the nature of the damage, whether it's property damage or bodily injury damage. OOB speaks to property damage. This case speaks to bodily injury damage. And thus, the only applicable penalty provision is that found in 1892 and requires proof of loss and requires proof of arbitrary, capricious, and without good cause. What do you say about the obligation of the carrier to make a policy search? Your Honor, there's no jurisprudence. There's no statute. Louisiana Insurance Code is very extensive. There's nothing in Louisiana Insurance Code saying an insurer has to do a policy search. Interestingly, the expert witness for the plaintiff cites no policy manuals from any insurer saying anybody is obliged to do a policy search. This is just his opinion based on what I'm not sure. But certainly, there's no authority, whether jurisprudential or legislative, that imposes this obligation upon an insurer to look all over all the policies it's ever issued to try and find if the policyholder who submits the claim through its retail broker picked the wrong policy. What about the general duty to investigate? There's no doubt there's a general duty to investigate, Your Honor. And that's outlined in, once again, the 1892 and 1973 statutes. But that is when a claim is presented in connection with a particular policy. Here, there was some discussion by Pelland concerning communications between the Zurich representative and the NUFIC representative, Mr. Spadacenta. And Mr. Spadacenta was very clear in his communications to the Zurich representative and to the broker on those two claims that were submitted. You have to tell us it is our policy, NUFIC's policy, that when you submit a claim, submit the policy number and the policy period so we can find out what we're dealing with. So you're saying that it was not a misrepresentation to Zurich because they were only talking about the particular policies and not all policies. Because he's saying that you all made a misrepresentation to Zurich by saying none of the policies – all of the policies contained in it asbestos exclusion. In other words, none of them could be potentially triggered by an asbestos case. Your Honor, 10 years – and I want to take us back to the word immediately – 10 years after the very first claim that may have involved this policy was filed. The first suit was filed in 1990. This activity starts in the year 2000. There were only three submissions made by ANCO through its broker to NUFIC. One was on an excess policy, 1982 excess policy, identifying the policy. There were two other submissions, both involving 1994 policies, the Mason and the Matt Valadez claims. On both those primary policies, the NUFIC claims representative responded, Mr. Spadacenta said, issued a reservation of rights letter to the broker, and then told Mr. Nilsen of Zurich. Under these policies, these policies, referencing those specific policies, we do not provide coverage. Thank you very much. If you submit any of the claims, please provide us with the policy number and the policy period so we can do the appropriate investigation. In fact, Your Honor, this is – Why does National Union not have any records? I mean, one thing about insurance companies, they have records. They may be in a warehouse that you have to take a key to and walk around for hours, but they have records. I don't really understand that. The policy was ultimately found. It was not a certified copy of the policy. No, I mean records of like this thing having to be found in some guy's personal folder somewhere in his desk. Why do you all not have a file jacket for a claim? I mean, where is that? Where are your records from all these years? Your Honor, certainly Mr. Spada sent ad records. There's no doubt about that. He kept personal records. Why there were not records concerning other submissions I don't know, but the only submissions that have been produced in this case, both by ANCO, ANCO's broker AON, NUFIC, and Zurich are these three submissions in 2000, the one excess policy and the two primary policies. I am just asking, did you all have like a fire or something at a warehouse or – Your Honor, I don't know. Okay. That's fine. Go ahead. All I know is that this insurance policy obliges the policyholder to immediately notify the insurer of a claim under the policy. And the policy also establishes that compliance with that policy clause is a conditioned precedent to coverage. The policy concluded in 1988. The first potential lawsuit was in 1990. There was nothing for 10 years until 2000. Then we had these communications in 2000, which primarily focused on the excess issue because the Zurich primary policies were being exhausted, and the insurer was told to contact its excess carers. After 2000, we hear nothing more until 1997 when ANCO finally sues all the excess insurers, and it was not until 2009 that ANCO finally submitted the claims to NUFIC under this one policy. So we basically have 22 years from the time the policy concluded until a formal submission under this policy is made. Your Honor, the trial court found that did not comport with the term immediately. Certainly the jurisprudence of the Fifth Circuit is consistent with the policy wording found in this policy and upholding termination of coverage in those instances. The Fifth Circuit, this court, and the courts of Louisiana have found that it is not the obligation of the courts to rewrite terms of insurance policies when they are clear and unambiguous. It is our position that the term immediately is clear and unambiguous. The term condition precedent is clear and unambiguous, and this court should affirm the district court's judgment. Okay. Let me ask you about the 2009 stuff. So when they start getting sued in 2009 and tendering those, do you all have an obligation? If they could implicate this 1988 policy, whatever it was, it doesn't have the exclusion. Do you have an obligation to defend those cases? Your Honor, the new cases, in other words, cases that are filed after 2009, once NUFIC has received notice and gets to look at the lawsuit, gets to compare the lawsuit with the insurance policy, yes, they do and they are. Okay. But it's the pre, all the old lawsuits. Well, I understand the pre, okay, because I'm still a little bit hung up on the penalties because they're still arguing that even if we only are looking at the 2009 and post, that you all haven't been doing what you're supposed to be doing. And I'm trying to understand why not. No, we are, Your Honor. Okay. You're saying you are. What is the issue on, the district court didn't decide the penalties issue under the post-April 2009 cases, I understand it. Is that right? Yes, Your Honor. So, what is the issue, I know that's still in the district court, but what is the issue on that? Your Honor, the district court basically found that the circumstances of this case, as presented by Engle, did not meet the statutory requirements for the imposition penalties. Okay. Did he say which requirements were not met? The trial court discussed the OOB case, which we've discussed in our brief, and found that to get the penalties that Engle wants, they can't get it the way, they can't get it through the OOB case. They have to go through 1972, which requires them to show a satisfactory proof of loss, and which requires them to show that the conduct, the conduct. Section 1892 or section 1973? 1892. 1892 is the applicable statute in this instance, not 1973. The trial court ruled that the failure of the duty to defend by the insurer is not one of those prescribed conducts contained in 1973. So it's out. 1973 is out. All you're looking at is 1892, and there's nothing in the record that shows that anything, that any of the, that the conduct of Newfick in connection with this case was violative of 1892. Well, is it your position that under both 1892 and 1973 that there is or is not a need to prove actual damages? Your Honor, 1892, first of all, under 1973, it has to be, the Louisiana Supreme Court says it has to be strictly construed. We don't have that on 1892. No. 1892 requires, A, as a predicate, provision of a satisfactory proof of loss, which there never has been here, and importantly requires that the insurer be found to be arbitrary, have engaged in arbitrary, capricious, and bad-faith conduct. And that's when the penalties kick in. Okay. There's not something still pending in the district court, is there? No. Okay. I just wanted to be clear. I'm sorry, Your Honor. So if we were to conclude that the question under 1892 focuses on whether there's been a satisfactory proof of loss, we would need to send that back? Because that hasn't been squared up. Is that right? Yes, Your Honor. Okay. In other words, it's our position that anger. I know. You all are saying they didn't suffer loss because they were getting a defense from somebody else. I get that. But if we were to say either that we don't think we should reach that issue until we know whether there was any proof of loss ever sent or that there isn't a requirement of actual damage, we would still need to address the satisfactory proof of loss question. Yes. But, Your Honor, it's our position that the core element of 1892 is not met here because there has to be evidence that the insurer acted arbitrarily. We didn't get these lawsuits until 22 years after the policy expired. It's difficult to see how that's arbitrary conduct. No, I'm talking about the 2009 forward, not the past. I understand about the past. I think that rises and falls on the other stuff. Yes. But on the new stuff, ANCO gets sued today on something that originates over 40 years of some guy working in the fields or whatever they do. Okay. And so it potentially triggers your 88 policy or whatever the right policy is. You have some sort of duty. The question is whether you met that duty or didn't to trigger the penalty. Yes. The primary argument made was this lack of damage. But I looked at the fact that on page 41 you made the argument about satisfactory proof of loss, which sounded like a good argument to me. But now I'm not sure that was properly raised. So, honey, go back and look at the record. You're basically saying it wasn't properly raised. So I'm saying, then, what do we do? Yes, Your Honor. The only evidence in the record from the deposition of, I believe, Mr. Fisher, who was the NUFIC representative who was deposed, was that, yes, when we NUFIC get claims in now, we look at the complaint, we look at the policy. If it's a covered loss, then we respond by paying our percentage that's been worked out with other primary carriers. And when the attorney fees come in, we pay them. Was there evidence that they'd failed to pay on any of those? Not that I'm aware of, Your Honor. I mean, there's an agreement in place with the other primary carriers. Well, can you move for summary judgment on the penalties issue? I mean, you can move for summary judgment on the whole case. Yes. All right. Well, I'll go back and study it. Any other questions, Your Honors? This was an occurrence policy, I gather. Yes, Your Honor. So all these suits arise because of an allegation that they had contact with ANCO insulation during the policy period, I guess. It was during the policy period, yes, Your Honor. Okay. Okay. Thank you, sir. Thank you, Your Honors. Okay, Mr. Mercer. Very briefly, Your Honors, I want to clear up the penalties. The trial court's basis for dismissing the penalty claims was that the statutes require ANCO to have suffered damage as a condition precedent to getting penalties. In other words, even if the National Union flushed them, threw them down the toilet, ANCO had to suffer damages. And the statutes, there are two statutes. Right, but we can affirm for any basis supported by the record below. That's why I was saying if we didn't agree on that issue, let's say, but you all never sent a satisfactory proof of loss, then you would still affirm on that. And that's how we got down this whole path of whether that was really raised and all this. And I'm going to go back and make my own investigation of that. Yeah, absolutely. And it was not. And the thing to keep in mind, too, with the duty to defend, all right, when these cases were tendered in 2009, Your Honor, there's really two aspects to it. There's past defense cost, which you would want to see some defense bills to determine how much you owe. And then there's ongoing, as of today, moving forward. So with respect to duty to defend, Your Honor, when you receive a petition, in order to evaluate your duty to defend that lawsuit, you have to do two things. If you have a petition, look at your policy. That's all you need to do. So that. But for penalty purposes, this isn't how we got in the discussion. There needs to be, even if they said, yeah, we'll defend, but let's say they don't do anything, because they're already being defended, right? They just sit there. Then how do we, so they say the day they receive it, oh, we'll defend. Okay. And then they don't do anything. No, that's fine. And I think that's what you've got to look at is, really, with respect to duty to defend, I think, A, it wasn't before the trial court as to the satisfactory proof of loss. And you can confirm that. But our position is, even as to the cases that were tendered in 2009. Could you go back and start where you started when you came up here for rebuttal and go right through the situation on the penalties and the two statutes? Yes, sir. Yes, sir. There are two bad faith penalty statutes. There's 1892 and there's 1973. The only statute at issue before this court in this case is 1892. 1892A1 says you have 30 days to respond to a tender. And that's my point, is when you get a lawsuit, you just need to respond in 30 days. But it's not to a tender. It's to a satisfactory proof of loss. Right. And for duty to defend, that lawsuit itself is the satisfactory proof of loss. You need nothing else to evaluate whether you have a duty to defend that. And who says that? Because, like I said, that's not how it's interpreted in Texas. And it may be interpreted differently in Louisiana. And that's fine. I'm looking for who says that. It's the four corners. It's a four-corner state. Your duty to defend. Well, it's an eight-corner state in Texas. Right. So your duty to defend is governed solely by that petition. So that's your satisfactory proof of loss for the duty to defend purposes. All right. Get back to my timeline. So 1892, in OOBE, the court interpreted 1892, A3, which provides that for penalties, you're going to get a penalty not to exceed two times the damages sustained or $5,000, whichever is greater. In OOBE, that court addressed, well, we don't see a requirement that the insured actually have had suffered damages because the penalty is the greater of either two times the damages sustained or $5,000. So if you didn't have any damages, zero times two is zero, but you still get the $5,000. So there's not a requirement of proof of damages under OOBE in 1892. Right. And we're under 1892. Here's where the twist comes in. 1892, for whatever reason, with respect to Section A1, which is the part we're here before you, we're under 1892 A1, but the penalties for that violation of A1, for whatever reason, they incorporate the penalty provisions of 1973 by reference. They say if you violate A1, stop reading, go look at 1973. Well, 1973, what it provides, and I quote, in addition to the amount of loss, a penalty of 50% on the amount found to be due to the insurer, by the insurer, or $1,000, whichever is greater. So my point is under either statute, there's no requirement that there be an actual out-of-pocket damage. What the plaintiffs, what the trial court held as well, OOBE. Unless you are hung up on the phrase in addition to. Right. Well, in addition to the amount, right, in addition to, but it says a 50% or, whichever is greater. Well, doesn't in addition to mean there must be something before you have in addition to? That's a legal question. And I think, you know, based on what the court did in OOBE, where they interpreted language not to exceed two times the damage is sustained, or what the court held as we're not going to add language to the statute, that is not there. That's not our job. Let me ask you this. If the insurer doesn't refuse to defend, if they get the tender and they see that the insurer is already being defended and they just don't say anything, I mean, they haven't, the insurer hasn't been heard, has he? I mean, why would there be a penalty attached to that? Well, because the statute requires you to respond within 30 days. Okay, but what it doesn't, it is not. It's a prompt pay statute. It says they shall pay the amount of any claim due and insured within 30 days after receipt of satisfactory proof of loss. So it's paying money. How can you pay money in response to a defense demand when there's not been any money expended? That's why in Texas, and again, I don't mean to suggest Texas controls here, but it's just a helpful analogy. In Texas, you have to have the actual fee bills to trigger something to pay. Otherwise, you have nothing to pay. No, but you have a duty to respond. But this is not a prompt response statute. You could have one, but it's not here. This is a prompt pay statute because it says shall pay. Okay. And then just to wrap up, I went back and looked to clarify. And the communications between Mr. Nilsen and Mr. Spadacento specifically talked about the AIG primary policy. So that was the crux of the conversation between Mr. Nilsen and Mr. Spadacento was the primary policy. And so at the end of the day, Your Honors. AIG. Yeah, AIG. National Union is AIG. Oh, okay. So at the end of the day, I think, like you said, there's questions of fact that were improperly resolved in the context of summary judgment. I'm not saying you wouldn't ultimately get there, but you couldn't get there the way he did. Okay. Thank you, gentlemen. We have your case, and that completes the docket for the morning. We'll be in recess.